# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESMELING BAHENA,<br><br>    Plaintiff,<br><br>    v.<br><br>RODRIGUEZ, et al.,<br><br>    Defendants. | Case No.  1:20-cv-01685-AWI-SAB (PC)<br><br>FINDINGS AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(ECF No. 36) |

Esmeling Bahena ("Plaintiff"), a state prisoner, is proceeding pro se and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983

Currently before the Court is Defendants' exhaustion-related motion for summary judgment, filed December 14, 2021.

**I.**

**PROCEDURAL BACKGROUND**

This action is proceeding against Defendant Harmon for excessive force and against Defendants Farlon, Rodriguez, Stan and Hernandez for failure to protect in violation of the Eighth Amendment.

Defendants filed an answer to the complaint on August 10, 2021.  (ECF No. 21.)

On August 11, 2021, the Court set this case for a settlement conference before Magistrate Judge Barbara A. McAuliffe on October 28, 2021, and stayed the case for eighty days.  (ECF No.

1

23.) On September 10, 2021, the Court granted Defendants' request to opt-out of the settlement conference, lifted the stay of the case, and issued the discovery and scheduling order. (ECF Nos. 27, 28.)

As previously stated, on December 14, 2021, Defendants filed the instant exhaustion-related motion for summary judgment and a motion to stay discovery and modify the scheduling order.[1] (ECF Nos. 36.) Plaintiff did not file an opposition and the time to do so has passed. Local Rule 230(l).[2] Accordingly, Defendants' motion for summary judgment is deemed submitted for review without oral argument. Id.

## II.

## LEGAL STANDARD

### A.   Statutory Exhaustion Requirement

Section 1997e(a) of the Prison Litigation Reform Act of 1995 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory unless unavailable. Exhaustion is required regardless of the relief sought by the prisoner and regardless of the relief offered by the process, Booth v. Churner, 532 U.S. 731, 741 (2001), and the exhaustion requirement applies to all prisoner suits relating to prison life, Porter v. Nussle, 534 U.S. 516, 532 (2002).

Section 1997e(a) also requires "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" Woodford v. Ngo, 548 U.S. 81, 90 (2006) (citation omitted). "Proper exhaustion demands compliance with an agency's deadlines and other critical

---

[1] On January 14, 2022, the Court granted Defendants' request to stay discovery and vacated the discovery and dispositive motion deadlines to be reset if necessary. (ECF No. 39.)

[2] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion. Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).

procedural rules because no adjudicative system can function effective without imposing some orderly structure on the course of its proceedings." Id. at 90-91. "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. 199, 218 (2007). "The obligation to exhaust 'available' remedies persists as long as *some* remedy remains 'available.' Once that is no longer the case, then there are no 'remedies … available,' and the prisoner need not further pursue the grievance." Brown v. Valoff, 422 F.3d 926, 935 (9th Cir. 2005) (emphasis in original) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)).

The failure to exhaust is an affirmative defense, and the defendant or defendants bear the burden of raising and proving the absence of exhaustion. Jones v. Bock, 549 U.S. at 216; Albino v. Baca, 747 F.3d 1162, 1166 (9th Cir. 2014). "In the rare event that a failure to exhaust is clear on the face of the complaint, a defendant may move for dismissal under Rule 12(b)(6)." Albino, 747 F.3d at 1166. Otherwise, the defendant or defendants must produce evidence proving the failure to exhaust, and they are entitled to summary judgment under Rule 56 only if the undisputed evidence, viewed in the light most favorable to the plaintiff, shows the plaintiff failed to exhaust. Id.

**B.      Summary Judgment Standard**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Albino, 747 F.3d at c1166; Wash. Mut. Inc. v. United States, 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, although it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026,

1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010). "The evidence must be viewed in the light most favorable to the nonmoving party." Williams v. Paramo, 775 F.3d 1182, 1191 (9th Cir. 2014).

Initially, "the defendant's burden is to prove that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." Albino, 747 F.3d at 1172. If the defendant meets that burden, the burden of production then shifts to the plaintiff to "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." Id. However, the ultimate burden of proof on the issue of administrative exhaustion remains with the defendant. Id. "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56." Id. at 1166. However, "[i]f material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." Id.

### III.

### DISCUSSION

**A.     Summary of CDCR's Administrative Appeal Process**

1.     Exhaustion Process Prior to June 2020

Prior to June 2020, the California Department of Corrections and Rehabilitation (CDCR) permitted its prisoners the right to administratively appeal any departmental decision, action, policy, omission, or condition that has an adverse material effect on the inmate's welfare. When filing appeals, inmates have to follow the procedures set forth in Title 15, sections 3084.1 through 3085 of the California Code of Regulations.[3]  Cal. Code Regs. tit. 15, §§ 3480-3085 (repealed eff. June 1, 2020), 3480-3487 (eff. June 1, 2020). An inmate appeal is typically initiated by submitted a CDCR Form 602, Inmate/Parolee Appeal (Form 602 or Appeal). Cal. Code Regs. tit. 15, § 3084.2(a). Under Title 15, a prisoner procedurally exhausts hi appeal by receiving a decision at the third and final level of forma review. Cal. Code Regs. tit. 15, §§

---

[3] All Title 15 references refer to the operative version in effect at the time of the incidents and relevant appeals in 2019-2020. This includes a modification of the appeals process which occurred in June 2020.

1  3084.1, 3084.7.

2  Inmates must describe the problem and action requested in the appeal form.
3  Inmates are required to list the staff members and the date of that staff member's involvement in
4  the issue under appeal. Cal. Code Regs. tit. 15, §§ 3084.2(a)(3), (a)(4).  If the inmate does not
5  have the requested identifying information about the staff member(s), he shall provide any other
6  available information that would assist the appeals coordinator in making a reasonable attempt to
7  identify the staff member(s) in question. Id. The inmate shall state all facts known and available
8  to him/her regarding the issue being appealed at the time of submitting the Inmate/Parolee
9  Appeal forms. Id.

10  When an inmate submits an appeal that does not comply with regulations governing the
11  appeal process, an appeals coordinator will reject and return the appeal with the reason for the
12  rejection and provide instructions to correct the defect, if correction is possible. Cal. Code Regs.
13  tit. 15, §§ 3084.6(b), (c), and (e).  An appeal that is cancelled cannot be resubmitted, but an
14  inmate may appeal the cancellation if he/she feels the cancellation is in error. Id. An appeal may
15  be rejected or cancelled for the reasons outlined in California Code of Regulations Title 15,
16  sections 3084.6 (b) and (c). Id.  If an appeal is rejected or cancelled, it is not exhausted. Cal.
17  Code Regs. tit. 15, §§ 3084.6(b), (c), and (e).  Rejection or cancellation of an appeal at any level
18  does not exhaust administrative remedies.  A referral to the Office of Internal Affairs or a request
19  for modification by a higher level of review does not exhaust an inmate's appeal. Cal. Code
20  Regs. tit. 15, § 3084.1, 3084.7(i)(2). The inmate must still appeal the decision through all three
21  levels of review and receive a decision at the third and final level in order to exhaust an appeal.
22  Id.  The Office of Appeals (OOA) receives, reviews, and maintains all non-medical inmate
23  grievances at the final level of review.  (Declaration of H. Moseley (Moseley Decl.) ¶ 2.)  A final
24  decision by the OOA generally exhausts an inmate grievance.  Id.

25      2.    <u>Exhaustion Process After June 2020</u>

26  As of June 1, 2020, a prisoner is required to follow the procedures set forth in California
27  Code of Regulations, title 15, sections 3480-3487. Cal. Code Regs. tit. 15, §§ 3480-3487 (eff.

28

June 1, 2020).  Subsequent to June 2020, inmates may now submit a written grievance containing one or more claims, subject to the requirements in section Cal. Code Regs., tit. 15, section 3482, to dispute a policy, decision, action, condition, or omission by CDCR or CDCR staff that causes some measureable harm to the inmate's "health, safety, or welfare." Cal. Code Regs. tit. 15, §§ 3481(a), 3482, 3482(a)(1) and (b), 3482(a)(2) and (c), 3485(a)-(b).  The grievance process now has two levels of review. Id.  The new process requires the inmate to submit a grievance in writing to the Institutional Office of Grievances (OOG) at the prison, reentry facility, or fire camp were they are housed within 30-days. Id. The inmate shall submit the grievance on a form 602-1, if available, or by other means provided by the institution. Id. If the inmate wishes to appeal the Institutional OOG decision, they may do so in writing to the Office of Appeals (OOA) within 30-days. Id.

After June 2020, the inmate must still describe all information known and available regarding the claim, including key dates and times, names and titles of all involved staff (or descriptions of those staff members), and names and titles of all witnesses to the best of the claimant's knowledge. Cal. Code Regs. tit. 15, §§ 3482(c)(2), 3482(c)(4), 3482(d)(3), 3485(d)(2), 3486(m), 3487, 3487(a).  Inmates must also include any and all supporting documents available. Id. Claims may be rejected for any of the reasons provided in Cal. Code Regs., tit. 15, § 3487, including failure to submit the claim within the applicable time frames, concerns an anticipated decision, duplicative, claim concerns harm to someone other than the claimant, and the claim concerns the regulatory framework of the grievance or appeal process itself. Id.  Completion of the review process by the Office of Appeals constitutes exhaustion of all administrative remedies available to a claimant. Id. A claim is not exhausted if it was disallowed pursuant to subsections 3482(d)(3) or 3485(d)(3) or rejected pursuant to subsection 3487(a). Id.  The OOA receives, reviews, and maintains all non-medical inmate grievances at the final level of review.  (Moseley Decl. ¶ 2.)  A final decision by the OOA generally exhausts an inmate grievance. Id.

///

///

**B.     Complaint Allegations**

On February 4, 2019, while housed at Kern Valley State Prison, Yard C, Building 4, Defendant correctional officer Farlon went to Plaintiff cell door and informed him to dress up because he was requested at the main yard office.  After Plaintiff got dressed, he was placed in mechanical restraints and when Plaintiff asked why, Farlon told him "I was order to place you on handcuffs and escort you to the office and that's what I'm doing."  As Plaintiff was being escorted to the office, Defendant officer Harmon told Plaintiff, "goodbye fucker."  Plaintiff then asked Defendant Farlon, "what is this all about?  E'm [sic] I going to the hole?"  Farlon told Plaintiff, "it all depends on you."

Once Plaintiff arrived at the Yard C program office, he was placed inside the sergeant's office where lieutenant Rodriguez, sergeant Stan, and special officer Hernandez were seated.  Lieutenant Rodriguez asked Plaintiff, "are you bad boy?"  Plaintiff answered "no" and advised that he did not go by any "moniker" and stated "you must have the wrong person sir."  Defendant Rodriguez became agitated and told Plaintiff, "look stupid, I know who you are and what's your monike[r], now I got this kite (note) that is from the 25ers (25ers is a prison gang) and it says that you are going to get stabb [sic], so stop being stupid and play ball with us ok?"

Rodriguez and Hernandez continued to tell Plaintiff that the kite implicated several 25er gang members and if Plaintiff cooperated they could get the gang members for conspiracy to commit murder since Plaintiff was the target of the kite which had been confiscated.  Plaintiff informed defendants Rodriguez, Stan and Hernandez that it was not him on the kite, nor did he have any knowledge of his life being in danger.  Plaintiff further told Defendants that if his life was in danger, he should be placed in administrative segregation and not be used as bait.

Defendant Rodriguez got very agitated and began to scream at Plaintiff telling him, "look you little pi[e]ce of shit, you are not going to tell us how to do our job, you don't want to play ball with us, ok than we are going to put you out there so you can get fucken kill."  Defendant Rodriguez then told Defendant Stan to give Plaintiff a waiver to sign, and Defendant Hernandez asked Plaintiff, "are you sure you want to go to the yard without working with us? You know you are going to get fuck up right?"  Plaintiff responded, "I don't want to get hurt, but I also

7

1  don't want to be working for you, so why don't you just send me to the hold (ad-seg)?"
2  Defendant Hernandez responded, "because you either work with us, or you are going back to the
3  yard on your own, we don't have a problem with you, our beef is with the 25ers, so help us get
4  them and we'll make sure that nothing happens to you, but either way you are going back to the
5  yard." Defendant Rodriguez then told Defendant Hernandez, "let him be, he doesn't have the
6  ball to work with us, that is why he's going to get his ass kick out there." Plaintiff again told the
7  Defendants that he did not want to get hurt and to either put him in ad-seg or move him out of
8  the yard. Defendant Stan gave Plaintiff a document to sign indicating that he did not have any
9  issues with inmates on Yard C, and Plaintiff was returned to his cell.

10        On February 4, 2019, at 12:00 p.m., Plaintiff cell door was opened so that he could go to
11  get his medication. After Plaintiff received his medication, he started to walk back to his cell
12  and he saw Defendants Rodriguez, Stan, Farlon and Hernandez. Hernandez told Plaintiff to face
13  the wall and he proceeded to search Plaintiff's body. Defendant Stan asked Plaintiff if he was
14  going to yard, and Plaintiff responded "yes." Defendant Rodriguez then said, "you better know
15  how to fight or you better of[f] staying in your cell." Defendant Stan allowed Plaintiff to go
16  back to his cell.

17        At approximately 1:00 p.m., the building control officer, John Doe Number 1 announced
18  via the loud speaker that yard was to be released, and about five minutes later Plaintiff was
19  released to the exercise yard. Plaintiff was worried about his safety given the information he
20  received from Defendants. While Plaintiff was walking around the yard, he noticed Defendants
21  Rodriguez, Stan, Farlon and Hernandez standing with the regular assigned yard officers. As
22  Plaintiff passed by the Defendants, he heard something like "get his ass kick."

23        As Plaintiff made his way to the utility yard, he was attacked by five inmates. The yard
24  officers and Defendants just watched what was happening and failed to intervene. The main
25  yard officer John Doe Number 2 was screaming orders to "get down" via the loud speaker.
26  However, Plaintiff continued to be beaten, while Defendants and the yard officers continued to
27  watch and failed to intervene. Defendant John Doe Number 2 continued to yell "get down" and
28  he directly shot Plaintiff with a 40 mm block gun. Plaintiff was knocked to the ground by the

8

1  impact of the rubber bullet that his him on the left side of his head.  Plaintiff continued to be
2  attacked after he fell to the ground.  Defendant Hernandez approached Plaintiff and the other
3  inmates and threw a pepper smoke grenade that blew up next to Plaintiff's face causing him to
4  lose consciousness.
5      As Plaintiff regained consciousness, he noticed that he was still on the ground and was
6  bleeding on the left side of his face and his vision was very blurry.  Plaintiff was then placed in
7  handcuffs and Defendant Harmon told Plaintiff to get up, but he was unable to.  Defendant
8  Harmon helped Plaintiff to his feet, and Plaintiff tried to sit down because he was dizzy but
9  Harlon did not let him.  Plaintiff then began to vomit and Defendant Harmon told Plaintiff, "you
10 better not got any fucken vomit on me."  Plaintiff continued to vomit and some of it landed on
11 Defendant Harmon's pants and boots.  Defendant Harmon got very agitated and slammed
12 Plaintiff to the ground causing him to land in puddle of mud.  Defendant Harmon continued to
13 yell profanity at Plaintiff, and Harmon put his knee on Plaintiff's back and with his hand he
14 started to press Plaintiff's head into the water and mud.  Plaintiff began to scream and Defendant
15 Harmon told Plaintiff to "shut [the] fuck up you stupid punk, you got vomit on me."  As Plaintiff
16 was screaming and crying other inmates on the yard began to yell at Defendant Harmon to let
17 Plaintiff out of the water and mud.  Defendant Rodriguez told Harmon to take Plaintiff to the
18 holding cell in the medical unit.  As the nurse began to exam Plaintiff, he began to vomit again
19 inside the holding cell.  The nurse told Plaintiff that he may have suffered a concussion and
20 advised him that she was going to "patch" him up and send him to the correctional treatment
21 center to see the doctor.  Defendant Stan asked the nurse to go in a room with Defendant
22 Rodriguez and they all talked for about two to three minutes.  Plaintiff told Defendants
23 Rodriguez and Stan that he needed medical attention, and Defendant Rodriguez said, "Don't cry
24 now, you were acting [tough] earlier, now look at you, you are crying like a little bitch."
25 Plaintiff continued to vomit and Rodriguez said, "look at you, you are still so scared that you are
26 vomiting and pissing your pants."  As the nurse continued to exam Plaintiff, Defendants
27 Rodriguez and Stan said that Plaintiff was probably a little drunk and that is why he got in
28

9

trouble on the yard.  The nurse then told Defendant Rodriguez that was probably the reason why his vision was blurry and why he was vomiting.

Approximately an hour later, Plaintiff was taken to the correctional treatment center and an x-ray was conducted on his left face.  Plaintiff was provided Tylenol 3 and sent back to his cell for a follow up in three to seven days.  When Plaintiff returned to his housing unit, the sergeant on duty asked Plaintiff what happened.  Plaintiff explained what happened and asked if he could be moved to a different yard because he did not want to be attacked again.  The sergeant told Plaintiff he would see what he could do.  Approximately fifteen to twenty minutes later, the sergeant told Plaintiff, "look I don't know what happen or what you did, but I can't move you out of this yard, I can't even send you to ad-seg as protection custody, I do not know what you did or didn't do but the Lt. Rodriguez made sure that you stay here, even after you got your ass kick!  All I can do for you is call medical and see if they'll up on you later on ok?"

On February 5, 2019, at approximately 8:00 a.m., pill call was conducted and Plaintiff noticed his face was swollen, he couldn't see out of his left eye, couldn't breathe out of his left nostril, and he was dizzy.  When Plaintiff went to medication window, he again asked for medical attention, but he was only given a couple of medical forms and told to submit them to get medical attention.

On or about February 7 or 8, 2019, Plaintiff asked one of the floor officers if he could move him out of the yard because he was still receiving threats from the inmates who had attacked him.  The officer advised Plaintiff that he could not move him and that he would have to talk with the institution committee or Defendant Rodriguez since he placed the order for Plaintiff to remain in Yard C.  However, the officer told Plaintiff "there is nothing indicating that you can't be move to a different building, so let me see if I can find a spot open in 2-block w[h]ere there is no 25ers ok?"

On the same day, Plaintiff was moved to building 2 where there is no prison gang members of 25ers and the inmates do not mingle.

On or about February 8, 2019, at approximately 8:30 p.m., Plaintiff walked out of his cell to get his medication and as he was waiting in line, he lost consciousness and fell to the ground.

10

Plaintiff was taken to the medical unit, and the registered nurse began to exam him and asked about his injuries and whether he was sent to an outside medical center.  Plaintiff informed the nurse that he only received gauze, an ice pack, Tylenol 3 and x-rays.  Plaintiff was then checked by the doctor who send him to the emergency room at Adventist Health Bakersfield Hospital.  The emergency room doctor ordered a CT scan of Plaintiff's head, and Plaintiff was given a pain reliever.  Plaintiff suffered a left eye orbital fracture and jaw arch fracture.  Plaintiff continues to receive medical treatment for the severity of his injuries due to the impact of the rubber bullet.

### C.    Statement of Undisputed Facts[4]

1.    Plaintiff is an inmate in the custody of CDCR.  (ECF No. 1, Compl. at 1; Declaration of D. Leyva (Leyva Decl.) ¶ 3; Moseley Decl. ¶ 6.)

2.    Plaintiff filed this action on November 20, 2020, regarding alleged incidents at Kern Valley State Prison (KVSP).  (ECF No. 1, Compl.)

3.    Plaintiff submitted multiple grievances to KVSP's Office of Grievances (OOG) between February 2019, when Plaintiff's allegations first giving rise to this lawsuit occurred, through November 20, 2020, when Plaintiff filed this action.  (Leyva Decl. ¶¶ 13-14, Exs. A-B; ¶¶ 19-25, Exs C-I.)

4.    None of the grievances Plaintiff submitted to the OOG during the relevant time frame concerned the allegations in his complaint.  (Leyva Decl. ¶¶ 15, 17, 19-25, Exs. C-I.)

5.    Each time Plaintiff submitted a grievance that was rejected or cancelled, Plaintiff was informed as to how to correct any issues with the grievance and any further actions he could take regarding the grievance.  (Leyva Decl. ¶ 25, Ex. I.)

6.    Plaintiff did not submit any appeals to the Office of Appeals (OOA) between February 2019, when Plaintiff's allegations first giving rise to his lawsuit occurred, through November 30, 2020, when Plaintiff filed the instant action.  (Moseley Decl. ¶ 6, Exs. A-B, ¶¶ 7-8.)

///

---

[4] Hereinafter referred to as "UF."

11

### D.     Analysis of Motion

Defendants argue that Plaintiff had access to the grievance and appeals system but failed to exhaust the claims asserted in this action.

Here, it is undisputed that an administrative exhaustion process was available to Plaintiff during the relevant time frame. (UF 3.) It is specifically undisputed that Plaintiff submitted multiple grievances to KVSP's OOG between February 2019, when Plaintiff's allegations first giving rise to this lawsuit occurred, through November 20, 2020, when Plaintiff filed this action. (UF 3.) None of the grievances Plaintiff submitted to the OOG during the relevant time frame concerned the allegations in his complaint. (UF 4.) Each time Plaintiff submitted a grievance that was rejected or cancelled, Plaintiff was informed as to how to correct any issues with the grievance and any further actions he could take regarding the grievance. (UF 5.) Plaintiff did not submit any appeals to the Office of Appeals (OOA) between February 2019, when Plaintiff's allegations first giving rise to his lawsuit occurred, through November 30, 2020, when Plaintiff filed the instant action. (UF 6.)

In addition, Plaintiff is not excused from the exhaustion requirement. A prisoner may be excused from complying with the PLRA's exhaustion requirement if he establishes that the existing administrative remedies were effectively unavailable to him. See Albino v. Baca ("Albino II"), 747 F.3d 1162, 1172-73 (9th Cir. 2014). When an inmate's administrative grievance is improperly rejected on procedural grounds, exhaustion may be excused as "effectively unavailable." Sapp v. Kimbrell, 623 F.3d 813, 823 (9th Cir. 2010); see also Nunez v. Duncan, 591 F.3d 1217, 1224–26 (9th Cir. 2010) (warden's mistake rendered prisoner's administrative remedies "effectively unavailable"); Ward v. Chavez, 678 F.3d 1042, 1044-45 (9th Cir. 2012) (exhaustion excused where futile); Brown v. Valoff, 422 F.3d 926, 940 (9th Cir. 2005) (plaintiff not required to proceed to third level where appeal granted at second level and no further relief was available); Marella v. Terhune, 568 F.3d 1024 (9th Cir. 2009) (excusing an inmate's failure to exhaust because he did not have access to the necessary grievance forms to timely file his grievance). Although Plaintiff did not file an opposition, the undisputed facts demonstrate that Plaintiff had access to the appeals process during the relevant time frame and he

filed multiple unrelated appeals during such time. (UF 3-4.) Plaintiff simply failed to submit and exhaust any appeals regarding the allegations presented in this action for which there is no excuse. Accordingly, Defendants' motion for summary judgment should be granted, and the instant action should be dismissed, without prejudice for failure to exhaust the administrative remedies.

## IV.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that Defendants' motion for summary judgment be granted and the instant action be dismissed, without prejudice, for failure to exhaust the administrative remedies.

This Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **twenty-one (21) days** after being served with this Findings and Recommendation, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  **February 11, 2022**

UNITED STATES MAGISTRATE JUDGE